# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 4820 | **DATE** | 6/27/2000 |
| **CASE TITLE** | RICHARD B. CLARK vs. CITY OF CHICAGO | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the City's motion for summary judgment is granted as to the Title II ADA claims in Counts I-III of Clark's amended complaint and the spoilation of evidence claim in Count V, and denied as to the Rehabilitation Act claim in Count IV. Status hearing set for 7/12/00 at 9:15a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | JUN 2 8 2000 | | |
| | Notified counsel by telephone. | | date docketed | | 96 |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TBK | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICHARD B. CLARK,      )
                 )
     Plaintiff,      )
                 )
     v.      )     No. 97 C 4820
                 )     Paul E. Plunkett, Senior Judge
CITY OF CHICAGO,      )
                 )
     Defendant.      )

DOCKETED

JUN 2 8 2000

## MEMORANDUM OPINION AND ORDER

Richard Clark has sued the City of Chicago ("the City") for its alleged violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq. ("ADA") (Counts I and III), the Rehabilitation Act, 29 U.S.C. § 794 (Counts II and IV) and, in the alternative, for spoilation of evidence (Count V). The City has filed a motion pursuant to Federal Rule of Civil Procedure 56(c) for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

### Facts

On October 13, 1986, Richard Clark became a Chicago police officer. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 4.) Five years later he was seriously injured in an off-duty car accident. (Id. ¶ 19.) As a result of the accident, Clark suffers from hemiparesis, a condition that affects his musculoskeletal system and impairs his ability to walk. (Id. ¶ 5.) Clark was on medical and disability leave from the City from the time of the accident until May 22, 1994. (Id. ¶¶ 20-21.)

In June 1994, Clark submitted to the Chicago Police Department a written request to return to work. (Id. ¶ 23.) The City, apparently, took no action on this request. (See Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 24, 3/29/95 letter to Zimmerman from Pribyl.)

On March 29, 1995, Clark submitted a written request for reasonable accommodation in the form of a job reassignment within the Police Department. (Id.) On April 3, 1995, the Director of the Police Department's Personnel Division wrote a letter to Clark's counsel stating:

> [W]e have sent instructions to Richard Clark regarding the procedure for requesting return to duty. When Mr. Clark initiates the application process we will conduct an evaluation of his condition in order to determine his functional capacity for work.
>
> Reinstatement to the Police Department is contingent upon the member's ability to perform unrestricted police duties. Until a determination is made as to his functional capacity no decision can be made in this matter.

(Id., Ex. 25, 4/3/95 letter to Pribyl from Sadler.)

On March 29, 1996, Clark received a letter from the Personnel Division instructing him to submit a Request for Reasonable Accommodation form and supporting medical certification. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 26.)[1] The letter stated that Clark would be referred to the City Personnel Division for consideration of alternative positions if it were determined that he was "unable to perform the essential functions of [his] position, with or without a reasonable accommodation." (Id.)

On April 12, 1996, Clark submitted a Request for Reasonable Accommodation form. (Am. Compl., Ex. D.) On it he stated that he had "limited gross motor skills (i.e. walking)" and "require[d] an assistive device" to walk for "distances greater than 1000 feet." (Id.) He also said that he would need "limited physical contact with prisoners during apprehension or processing" and

_____

[1] The record does not explain the nine-month lapse between Clark's 1994 and 1995 requests for reinstatement or the one-year lapse between the City's 1995 and 1996 letters of instruction to Clark.

that he would " be unable to physically apprehend suspects or participate in foot pursuits," but that "[i]n an office setting, [he] really [had] no restrictions." (Id.) The specific accommodation he requested was "a sedentary position with a light work capacity within the Chicago Police Department." (Id.)

On May 28, 1996, a nurse from the Police Department Medical Section called Clark and told his mother that he would need to take a firing range test before he could be reinstated. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 28.) She scheduled the test for May 30, 1996 fully aware, plaintiff claims, that he used a wheelchair. (Id.)

On May 30, 1996, Clark took the firing range test while seated in his wheelchair. (Id. ¶¶ 29-30.) Clark was told by the firing range instructor who administered the test that he had passed. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 44.) In June 1996, Clark was told that his firing range test was invalid because a sergeant had not witnessed it. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 46.)

On July 1, 1996, the Director of the Police Department of Personnel wrote a letter to Clark's counsel informing her that "the firearm qualification test administered to Richard Clark while he was seated in a wheelchair was not valid. To be considered a valid test the Department of Police requires all members to stand." (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 28, 7/1/96 letter to Pribyl from Sadler.) The letter also said:

> All sworn members are required to work a minimum of forty (40) hours per week.
> Members are also required to be available for additional time on duty as job needs
> dictate. Any question of the requirement for sworn members to be available for
> additional duty should be readily answered by the example of extra police service
> provided on the final three nights of the recent Bulls championship series.

(Id.) According to the letter, the Police Department would cease processing Clark's request to return to work until he provided medical certification of his ability to work forty hours per week and

additional time as need, and completed "the required firearm qualification course." (Id.) There was no mention in this letter of the "sergeant present" requirement previously presented to Clark. (Id.)

Subsequently, Clark submitted to the Department a letter from his doctor that stated: "[Clark] is currently ready to return to work at a sedentary position for 8 hours a day, five days a week. He does require an assistive device in order to stand and walk safely at this time." (Id., Ex. 22, 7/17/96 letter to Sadler from Ito.) When the Police Department received this information, it wrote a letter to Clark's counsel saying: "In light of the recent development in Mr. Clark's ability to work in a full time capacity, the Chicago Police Department will reinitiate the return to work process for Mr. Clark." (Am. Compl., Ex. H.) The letter also reiterated the Department's position that Clark could return to work only if he could pass the firearms qualification test in a standing position. (Id.) Clark has yet to be reinstated.

Clark seeks to return to the Police Department in limited duty status. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 44.) The Police Department's policy is to place a sworn member in limited duty status "when, for an indefinite period of time, [he] will not be able to perform full duty tasks." (Def.'s LR 56.1(a)(3) Stmt., Ex. T, Addendum No. 3, General Order 98-2.) Clark cannot return to a limited duty position, the City says, because he does not meet the minimum eligibility requirements for all sworn police officers, including: (1) the ability to "safely carry, handle, and use [a] Department approved firearm," as demonstrated by passing the firing range test in a standing position; and (2) the ability to "maintain an independent and stable gait without the assistance of external ambulatory supporting devices (e.g., crutches, canes, walkers, wheelchairs, etc.)." (Id.) Clark contends that those functions are not, in fact, essential for limited duty officers, and that assigning him to a limited duty position is a reasonable accommodation to his disability.

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

## Discussion

### ADA Claims

In its motion, the City argues that Title II of the ADA does not encompass employment discrimination claims. The City did not make this argument in its motion to dismiss Clark's original complaint[2] or plead this affirmative defense in its answer to his amended complaint. Ordinarily, failure to plead an affirmative defense results in waiver of the defense. DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 334 (7th Cir. 1987). "But when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal." Id. Because Clark had an opportunity to address this issue in his brief in opposition to the City's summary judgment motion, we will address the merits of this defense.

---

[2]The Court did not, as Clark contends, reject the City's argument when it decided the City's motion to dismiss, (see Pl.'s Opp'n City's Mot. Summ. J. at 18), because the City did not raise the argument in that motion.

The view that Title II encompasses employment discrimination claims is based largely on a regulation promulgated under the statute, which provides: "No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity." 28 C.F.R. § 35.140(a); see 42 U.S.C. § 12134 (directing Attorney General to promulgate regulations to implement Title II of the statute). The question is whether that regulation is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and if so, whether it is based on a reasonable interpretation of the statute. Id. at 843-44.

The Seventh Circuit has not yet decided this issue. Moreover, the two circuit courts of appeal that have squarely addressed it have reached opposite results. Compare Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169, 1173 (9th Cir. 1999) (disregarding regulation because "Congress unambiguously expressed its intent for Title II not to apply to employment"), petition for cert. filed, 68 U.S.L.W. 3129 (U.S. Aug. 10, 1999) (No. 99-243) with Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 822-23 (11th Cir.), cert. denied, 525 U.S. 826 (1998) (holding that "employment coverage is clear from the language and structure of Title II" and deferring to the Attorney General's "reasonable construction of the statutory language."). In the absence of clear guidance, we will conduct our own analysis to determine whether Clark's Title II claims are viable.

In Chevron, the Supreme Court held that agency interpretations are entitled to deference only when Congress has not directly spoken to the issue in the statute. Id. at 842-43  If "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id.  If, however, the statute is silent or

ambiguous on the issue, then we must defer to the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 843-44.

The first step, then, is to determine whether Congress expressed an intention to have Title II apply to employment discrimination claims. We do that by "focus[ing solely] on the text of the statute," United States v. Dierckman, 201 F.3d 915, 923 n.12 (7th Cir. 2000), and "employing traditional tools of statutory construction" to ascertain Congress' intent. Chevron, 467 U.S. at 843 n.9.

In relevant part, Title II provides:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The statute defines the term "public entity" as any State or local government and "any department, agency, special purpose district, or other instrumentality of a State or . . . local government." 42 U.S.C. § 12131(1). It does not, however, define the terms "services," "programs," or "activities." "Absent specific statutory definitions, words in a statute are presumed to have their ordinary or natural meaning." Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Leaseway Transp. Corp., 76 F.3d 824, 828 (7th Cir. 1996). Employment is not a service, program or activity of a public entity, as those words are commonly understood. Rather, services, programs and activities usually refer to the "products" offered by public entities like public transportation and parks and recreation facilities. See Zimmerman, 170 F.3d at 1174 (discussing common usage of services, programs and activities). Because employment is not a service, program or activity of a public entity, an employment discrimination claim cannot be premised on the first clause of 42 U.S.C. § 12132.

The second clause of that provision, however, is much broader. It states that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any such entity." <u>Id.</u> Some courts have held that this clause is a general prohibition against discrimination, including employment discrimination. <u>See, e.g., Bledsoe</u>, 133 F.3d at 821-22 ("[T]he prohibition in the final clause of the section . . . protects qualified individuals from being 'subjected to discrimination by any [public] entity,' and is not tied directly to the 'services, programs, or activities' of the public entity.") (quoting 42 U.S.C. § 12132); <u>Innovative Health Sys., Inc. v. City of White Plains</u>, 117 F.3d 37, 44-45 (2d Cir. 1997) ("[T]he language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of the City. Rather, it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context . . . .") (zoning case). This interpretation, however, conflicts with other provisions of Title II and the structure of the ADA as a whole.

To prevail on any ADA claim, a plaintiff must prove that he is a "qualified individual with a disability." Title II defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). By requiring that each Title II plaintiff "meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity," Title II's definition of a "qualified individual with a disability" ties the general prohibition against discrimination found in the second clause of 42 U.S.C. § 12132 to the "services, programs or activities" of the public entity. Because, as we discussed above, employment is not a

service, program or activity of a public entity, employment disputes do not fall within the purview of Title II.

Our interpretation is also supported by the structure of the ADA as a whole. The ADA is divided into three titles. Title I, which is entitled "Employment," prohibits covered entities from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. The term "qualified individual with a disability" is defined in Title I as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Title I's definition of the term "reasonable accommodation" includes "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). Title I incorporates the procedures and remedies of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., including those that require charges of employment discrimination to be filed with and investigated by the EEOC. 42 U.S.C. § 12117.

By contrast, Title II, which is entitled "Public Services," does not mention employment. It does not define "qualified individual with a disability" or any other statutory term with reference to employment. See 42 U.S.C. § 12131. In fact, the terms "employer," "employee" and "employment" do not appear anywhere in Title II. Moreover, Title II incorporates the procedures and remedies of the Rehabilitation Act, which do not require plaintiffs to pursue any relief through the EEOC. 42 U.S.C. § 12133. Given Title I's comprehensive employment provisions, we must interpret Title II's silence on the subject as a deliberate Congressional choice, not an error in need of correction.

Russello v. United States, 464 U.S. 16, 23 (1984) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alterations, internal quotation marks and citation omitted).

Finally, interpreting Title II to encompass employment discrimination claims would make many of Title I's provisions redundant, a violation of one of the canons of statutory construction. Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S. 552, 562 (1990) (noting the Supreme Court's "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment"). Any public employee who works for an employer with 15 or more employees is covered by Title I. 42 U.S.C. § 12111(5). Recognizing an employment discrimination cause of action under Title II would nullify Title I's application to those public employees, allowing them to evade the administrative process by which Congress clearly intended them to abide. Like the Supreme Court, we are reluctant to interpret any statute in this manner, and have no reason to do so in this case.

In sum, the ADA clearly expresses Congress' intent that employment claims be governed exclusively by Title I. Thus, under Chevron, the regulation to the contrary promulgated by the Attorney General is entitled to no weight. 467 U.S. at 842-43. Because there is no cause of action for employment discrimination in Title II of the ADA, the City's motion for summary judgment on the ADA claims asserted in Counts I-III of the amended complaint is granted.

## Rehabilitation Act Claim

In Count IV of his amended complaint, Clark alleges that the City violated his rights under the Rehabilitation Act by failing to reasonably accommodate his disability. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . . ." 29 U.S.C. § 794(a). To prevail on this claim, Clark must show that: (1) he is disabled; (2) the City was aware of his disability; (3) he was otherwise qualified for the job; (4) the job exists as part of a program receiving federal financial assistance; and (5) his disability caused the adverse employment action. <u>Foster v. Arthur Andersen, LLP.</u>, 168 F.3d 1029, 1032 (7th Cir. 1999); 29 U.S.C. § 794(a).

There is no dispute that Clark has proven four of the five elements of his claim. Clark is disabled within the meaning of the statute because he suffers from hemiparesis, a physical impairment that affects his musculoskeletal system and substantially limits the major life activity of walking, and the City was aware of that disability. (<u>See</u> Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 5); 42 U.S.C. § 12102(2)(A)[3]; 29 C.F.R. § 1630.2(h)(1), (i), (j)(1)(ii); <u>see also</u> 28 C.F.R. § 41.31(a), (b)(1)(i), (b)(2) (defining "handicapped person" as used in Rehabilitation Act). The City's Police Department receives federal financial assistance, and the City refused to reinstate Clark because of his disability. (Def.'s Answer Am. Compl. ¶ 29; <u>id.</u>, Count IV, ¶ 29.)

---

[3]We use the standards set forth in Title I of the ADA to evaluate Clark's Rehabilitation Act claim. <u>See</u> 29 U.S.C. § 794(d) ("The standards used to determine whether [the Rehabilitation Act] has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under title I of the Americans with Disabilities Act . . . .").

The dispute centers on whether Clark is otherwise qualified for the job. The City contends that he is not, because he cannot perform two of the essential functions of the job of police officer: (1) shooting his weapon while standing; and (2) maintaining a stable gait without the assistance of an external ambulating device. Clark disagrees, arguing that limited duty police officers are not required to perform either function.

The essential functions of a job are the "fundamental job duties" of the position. 29 C.F.R. § 1630.2(n)(1). A job function may be essential because: the position exists to perform that function, there is a limited number of employees to whom that function can be assigned or the function is so specialized that the employee was hired specifically to perform it. 29 C.F.R. § 1630.2(n)(2). "The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform [those] functions. . . ." 29 CFR § 1630, App. Evidence of whether a particular function is essential includes:

(i)     The employer's judgment as to which functions are essential;
(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)   The amount of time spent on the job performing the function;
(iv)    The consequences of not requiring the incumbent to perform the function;
(v)     The terms of a collective bargaining agreement;
(vi)    The work experience of past incumbents in the job; and/or
(vii)   The current work experience of incumbents in similar jobs.

29 CFR § 1630.2(n)(3).

The City focuses primarily on the first two factors. The ability to shoot while standing and to independently ambulate are functions essential for all police officers, it claims, because a Police Department General Order in effect before Clark was injured establishes that they are. That Order, which sets forth the minimum eligibility requirements for officers assigned to limited/convalescent duty, requires them to be able to "safely carry, handle and use [their] Department approved,

-12-

prescribed firearm" and to "maintain an independent and stable gait without the assistance of external ambulatory supporting devices." (Def.'s LR 56.1(a)(3) Stmt., Ex. T, Addendum No. 3, Police Department General Order 98-2.) An officer can safely carry, handle and use a weapon, the City asserts, only if he has the "ability to move and take cover." (Id. ¶ 7.) Thus, the City concludes, to demonstrate his ability to safely carry, handle and use a weapon, each officer must pass a firing range test from a standing position. (Id. ¶ 17.)

Plaintiff, however, has adduced evidence that the City does not actually require its limited duty officers to perform those allegedly essential functions. Clark identifies four current or former Chicago police officers who were, or are, on limited duty status and used wheelchairs, canes or walkers to ambulate. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 52(1)-(4).) And, at least one of those officers, Donald Rehling, used his walker when he took his firing range test. (Id. ¶ 52(3).)

Defendant admits that exceptions were made for those officers (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 52(1)-(4)), but argues that its past decisions do not control the outcome of this case. In its view "the fact that an overaccommodation may have been made [in the past] does not mean that it must be extended to plaintiff." (Def.'s Mem. Supp. Mot. Summ. J. at 13.) But the City "overaccommodated" those officers only if independent ambulation and standing while shooting are, in fact, essential functions for limited duty police officers. If they are not, the City's assignment of those officers to limited duty was not an "over accommodation," but a reasonable accommodation to their inability to fulfill the essential functions of the full duty police officer position. See 29 C.F.R. § 1614.203(g) ( "When a nonprobationary employee becomes unable to perform the essential functions of his or her position even with reasonable accommodation due to a handicap, an agency shall offer to reassign the individual to a funded vacant position located in the same commuting area

-13-

and serviced by the same appointing authority, and at the same grade or level, the essential functions of which the individual would be able to perform with reasonable accommodation if necessary unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program.); Gile v. United Airlines , Inc., 95 F.3d 492, 498 (7th Cir. 1996) (holding that Title I of the ADA "may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position.")

Viewed favorably to Clark, the record does not support the City's claim that the essential functions of the police officer job are the same for both full and limited duty officers. It is undisputed that the police department assigns an officer to limited duty status "when, for an indefinite period of time, the [officer] will not be able to perform full duty tasks." (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 43, Addendum No. 3, Police Department General Order 98-2; id., Ex. 20, Police Department Convalescent Duty-Limited Duty Assignment/Release (listing job restrictions like "no climbing," "no strenuous exertion," "limited use of hands"[4]). ) It is also undisputed that officers on limited duty status are generally assigned to either the Alternate Response Unit or the Field Inquiry Unit, both of which are administrative units to which the public has no access. (Id., Ex. 4, Cascio Dep. at 21-23; Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 20, 28.) The duties of officers in the Alternate Response Unit are "to process information from a non-emergency call, [and] prepare

---

[4]The face of this exhibit identifies it as a Chicago Police Department document dated February 1981. Though the City does not deny that this exhibit is one of its own documents or claim that it is outdated or otherwise unreliable, it nonetheless requests that we strike the document for lack of authentication and foundation. We decline this and all similar invitations by the City to strike, for lack of authentication and foundation, its own documents from the papers plaintiff submitted on this motion.

a preliminary case report, which involves handwriting a report and doing a telephone investigation to determine whether the information [meets] the criteria for creating a criminal incident report." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 25.) Officers assigned to the Field Inquiry Unit "do background checks on individuals" and "clerical work, answering the telephone, pulling a record, filing." (Id., Ex. 4, Cascio Dep. at 34-35.) Unlike their full duty counterparts, officers assigned to these units do not: (1) patrol a beat by vehicle or on foot; (2) intervene in and observe situations that require attention, and be visible to prevent crime from occurring; (3) respond to a variety of assignments such as crimes in progress, accidents, damage to property, domestic and other disturbances; (4) protect a crime scene until detectives or supervising officers arrive; (5) examine a crime scene for evidence, and question suspects, victims and witnesses to gather information; (6) respond to a variety of emergencies, and pursue suspects on foot over a variety of terrain and obstacles; (7) handle and transport bodies; (8) direct traffic and issue traffic citations; or (9) serve warrants, subpoenas and other court orders. (Id., Ex. 4, Cascio Dep. at 38-40.) The City admits that the duties of officers in the Alternate Response Unit do not require independent ambulation, (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 26[5]), and there is no evidence that independent ambulation is required in the Field Inquiry Unit either. In fact, the City admits that Officer Donald Rehling, who walks with a walker and used it to take his firearm test, is currently assigned to the Alternate Response Unit. (Id. ¶ 52(3).) Moreover, though all officers are required to have their weapons at work, (id. ¶ 28), there

_____

[5]The City tries to deny this fact statement, claiming that it is a mischaracterization of Commander Sadler's testimony. (See Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 26.) In fact, Sadler testified that: "the large percentage of work in the Alternate Response Unit is done sitting down" and "the parts of the work that have to be done standing up" can be done with an assistive device. (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 15 at 167-68.) Thus, the fact statement is directly supported by Sadler's testimony.

is no evidence that any officer assigned to either the Alternate Response Unit or the Field Inquiry Unit has ever had to use it. (Id. ¶ 28.).

The situation in this case is very similar to that in Stone v. City of Mount Vernon, 118 F.3d 92 (2d Cir. 1997). Stone was a firefighter for the City of Mount Vernon who was injured in an off-duty accident. Id. at 93. After the accident, he could walk only for short periods of time and only with the assistance of leg braces. Id. Though he could no longer perform full fire-fighting duties, Stone requested reinstatement to one of the department's two light-duty bureaus. Id. at 94. The City refused to reinstate him because it viewed fire suppression activities as an essential function of the firefighter position, regardless of the bureau to which any firefighter was assigned. Id. When plaintiff sued the City under the ADA and the Rehabilitation Act, the district court sided with the City, holding that the ability to fight fires was an essential function of all of the firefighter positions in the City's Fire Department. Id. at 99.

The Second Circuit reversed. In its view, "the district court gave undue weight to the title 'firefighter,'" rather than "focus[ing] on the fundamental job duties of the employment position [the plaintiff] . . . desire[d]" Id. (internal quotation marks and citation omitted). Because the record did not show that firefighters assigned to the light-duty bureaus ever engaged in fire suppression activities or that their inability to do so would hamper the department's ability to provide fire protection, the Second Circuit concluded that the City should not have been awarded summary judgment on Stone's claims. Id. at 101.

Like the court in Stone, we must focus on the duties of the job Clark seeks, a limited duty officer assigned to either the Alternate Response Unit or Field Inquiry Unit, not on the title "sworn police officer." Viewed favorably to Clark, the record suggests that such limited duty officers are

neither required to shoot their weapons while standing nor to independently ambulate. Moreover, there is no evidence to suggest that those officers' inability to perform those functions hampers the Chicago Police Department's ability to protect the public. Under the circumstances, a jury could reasonably conclude that shooting a weapon while standing and independently ambulating are not essential functions of the limited duty police officer position that Clark seeks, and thus, that Clark is "otherwise qualified" for that position.

The cases cited by the City do not compel a different result. In <u>Etheridge v. State of Alabama</u>, 860 F. Supp. 808 (M.D. Ala. 1994), plaintiff was dismissed from the police academy because he was unable to shoot successfully in the two-handed Weaver stance. The State claimed that shooting in that stance was an essential function of the police officer job and the court agreed because the plaintiff "presented no evidence whatsoever that the Weaver stance is not an essential function." <u>Id.</u> at 816. In this case, however, Clark has adduced sufficient evidence to cast doubt on the City's claim that the ability to independently ambulate and shoot while standing are essential functions of the limited duty police officer position.

Also distinguishable are <u>Leisen v. City of Shelbyville</u>, 153 F.3d 805 (7th Cir. 1998) and <u>Santos v. Port Auth. of N.Y. & N.J.</u>, No. 94 Civ. 8427 (JSM), 1995 WL 431336 (S.D.N.Y. July 20, 1995). Leisen was discharged from her position as a probationary firefighter because she had not obtained the required paramedic certification. Santos was discharged from his restricted duty position with the Port Authority because he was unable to perform the strenuous physical activities required of a full duty officer. In both cases, the employers actually required all incumbents in the jobs from which the plaintiffs were discharged to meet the standards that plaintiffs could not. <u>Leisen</u>, 153 F.3d at 806 (no dispute that the City of Shelbyville "required all new firefighters either

to be certified paramedics or to achieve that status within three years of their date of hire"); Santos, 1995 WL 431336, at *3 (even officers assigned to clerical tasks must be able to perform strenuous physical activity because the Port Authority prohibits officers from being assigned "to any single particular task for the duration of a tour of duty."). By contrast, in this case there is evidence to suggest that the City does not actually require its limited duty police officers to shoot while standing or to ambulate independently. Thus, the cases the City cites do not control the outcome of this motion.

The City's second argument, that the necessity of these functions is illustrated by the consequences that would result if the City exempted some officers from performing them, is no more persuasive. Though the City concedes that "some assignments are less likely to require an officer to use physical force," it asserts that "officer[s] may be required to work different assignments with varying physical demands based on operational needs." (Def.'s Mem. Supp. Mot. Summ. J. at 9.) Because "any officer may be confronted with a situation requiring the safe handling of the officer's firearm and the possible use of deadly force," the City concludes, all officers must be able to ambulate independently and shoot from a standing position. (Def.'s Reply Mem. at 6.)

The operational necessity argument is not supported by the record. It is undisputed that the City employs approximately 13,200 sworn police officers, 340 of whom were on limited duty status on March 2, 1999. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 1-2.) It is also undisputed that officers assigned to limited duty are, by definition, unable "to perform full duty tasks," and can remain in that status for the rest of their careers. (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 43, Addendum No. 3, Police Department General Order 98-2; Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 4.) The City does not send limited duty officers out on the street, even during events like the Chicago Bulls

Championships when all essential and non-essential patrol officers are assigned to the street. (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 4, Cascio Dep. at 58-60.) There simply is no evidence that the operational needs of the Chicago Police Department, in fact, require limited duty officers "to work different assignments with varying physical demands," as the City asserts.

We are also not persuaded that Clark's receipt of Social Security Disability Insurance ("SSDI") necessarily renders him "unqualified" for the job. In <u>Cleveland v. Policy Management Sys., Corp., Inc.</u>, 526 U.S. 795 (1999), the Supreme Court held that receipt of SSDI benefits "does not automatically estop the recipient from pursuing an ADA claim." <u>Id.</u> at 798. However, "a plaintiff cannot avoid summary judgment merely by asserting that [he] is a qualified individual if [he] made prior statements, in applying for SSDI, regarding [his] disability that are squarely contradictory." <u>Feldman v. American Memorial Life Ins. Co.</u>, 196 F.3d 783, 791 (7th Cir. 1999). Rather, he must provide an explanation for the inconsistency "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the [SSDI statement] the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" <u>Cleveland</u>, 526 U.S. at 807.

Clark admits that he received SSDI benefits. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 45.) The Social Security Act provides benefits to people who are unable "to engage in any substantial gainful activity by reason of any . . . physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment, however, must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy." 42 U.S.C. § 423(d)(2)(A). Thus, at some point, Clark must have represented to the Social Security Administration that he was "unable to engage in any . . . kind of substantial gainful work."

The record, however, does not disclose what representations Clark made to the Social Security Administration or when he made them. The only evidence even tangentially related to SSDI is the testimony of Clark's physician, Dr. Ito. Dr. Ito testified that she wrote a letter, dated December 10, 1997 and addressed to whom it may concern, that stated "[Clark's] injuries have precluded employment since the onset of his accident." (Def.'s LR 56.1(a)(3) Stmt., Ex. B, Ito Dep. at 64-65.) But she did not recall why she had written the letter or to whom it was directed. (Id., Ex. B, Ito Dep. at 65.) Thus, it does not constitute evidence of Clark's representations to the Social Security Administration. Absent such evidence, we do not know whether: (1) Clark told the Social Security Administration that he was disabled because he could work only with a reasonable accommodation, a factor not considered under the Social Security Act; or (2) he applied for benefits immediately after his accident, before time and physical therapy improved his condition; or (3) his disability was one that the Social Security Act categorically considers disabling "without consideration of the individual's actual level of impairment," all of which are acceptable explanations for the ostensibly inconsistent representations. See Feldman, 196 F.3d at 790-91. Because there is nothing in the record to suggest that Clark's representations to the Social Security Administration preclude his recovery under the Rehabilitation Act, we cannot grant the City summary judgment on that basis.

A jury could also conclude from the record before us that the accommodation of a limited duty assignment is a reasonable one that would not impose undue hardship on the City. See 29 C.F.R. § 1614.203(g) (including job reassignment as accommodation under Rehabilitation Act); 29

C.F.R. § 1630.2(p) (defining "undue hardship" as "significant difficulty or expense incurred" in providing the accommodation). It is undisputed that there are positions available in the two units to which Clark wishes to be assigned. (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 4, Cascio Dep. at 24.) In fact, limited duty officers are placed in the Field Inquiry and Alternate Response Units because "they always have an opening . . . . They are always looking for people." (Id.) Though many officers are on limited duty for short periods of time, the City admits that officers can stay on limited duty for the rest of their careers. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 4.) The City does not rely on limited duty officers for street duty, even for big events like the Chicago Bulls Championships (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 4, Cascio Dep. at 58-59), and there is no evidence that police service is compromised as a result. Because the record indicates that the City has limited duty positions available and that assigning Clark to one of them would not cause it undue hardship, the City has not established that reinstating Clark to a limited duty position is an unreasonable accommodation to his disability.

In short, the record reveals a genuine issue of material fact on whether the ability to independently ambulate and to shoot a weapon while standing are essential functions for limited duty police officers, and whether a limited duty assignment is a reasonable accommodation to Clark's disability. Accordingly, the City's motion for summary judgment on Clark's Rehabilitation Act claim in Count IV is denied.

In Count V, Clark asserts a state law claim for spoilation of evidence for the City's destruction of the medical file of J.F., a deceased police officer who used a wheelchair at work. To prevail on this claim, Clark must prove that the City had a duty to preserve J.F.'s medical file, it breached that duty and that Clark had a reasonable probability of succeeding in this suit, but for the

City's destruction of the file. <u>Boyd v. Travelers Ins. Co.</u>, 166 Ill. 2d 188, 194-97 & n.2, 652 N.E.2d 267, 270-71 & n.2 (1995).

The City argues that it had no duty to preserve J.F.'s medical file. Though there is no general duty to preserve evidence, such a duty "may arise through an agreement, a contract, a statute or another special circumstance." <u>Boyd</u>, 166 Ill.2d at 195, 652 N.E.2d at 270-71. "[A] defendant owes a duty of due care to preserve evidence if a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." 166 Ill.2d at 195, 652 N.E.2d at 271.

The undisputed facts of this case establish that the City had a duty to preserve J.F.'s medical file. The City admits that Clark asked it to produce the file in September 1999. (Def.'s Resp. Pl.'s LR 56.1 (b)(3)(B) Stmt. ¶¶ 55-57.) It also admits that Clark filed a motion to compel production of that and other files in October 1999. (<u>Id.</u> ¶ 59.) Further, during the hearing on that motion, the City's counsel told the Court that he had reviewed portions of the requested files. (<u>Id.</u>) A few weeks later, the City reported that it had destroyed J.F.'s file pursuant to its document retention policy. (<u>Id.</u>; Def.'s LR 56.1(a)(3) Stmt. ¶¶ 49-50.) Under the circumstances, there can be no question that the City knew J.F.'s file was material to this litigation. Consequently, it had a duty to preserve the file, a duty it admits to having breached. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 59.)

Clark falters on the last element, however, because J.F.'s medical file is not the linchpin of this case. The City admits that J.F. became a police officer in 1963, suffered a stroke in 1981 that left him with a right hemiparesis and an inability to speak, and used a wheelchair thereafter. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 52(1).) The City also admits that after his stroke, "J.F. never returned to an active duty assignment," but worked in the Gun Registration Unit from 1983 until he retired

in 1990. (<u>Id.</u>) Finally, the City admits that the same minimum eligibility requirements it seeks to enforce against Clark were in effect during J.F.'s tenure with the Police Department. (<u>Id.</u>) It is clear, given these admissions, that J.F. could neither ambulate independently nor shoot while standing after his stroke, was nonetheless reinstated to a sworn position when the minimum eligibility requirements at issue in this case were in effect, and served in a sworn position, using a wheelchair, for seventeen years. Those are the most salient points for Clark's Rehabilitation Act claim. Though the medical file might have contained additional relevant information, such information would not make or break Clark's claim. Because the record does not suggest that Clark's success in this suit hinges on the information in J.F.'s medical file, the City's motion for summary judgment on the spoilation of evidence claim in Count V is granted.

### Conclusion

For the reasons set forth above, the City's motion for summary judgment is granted as to the Title II ADA claims in Counts I-III of Clark's amended complaint and the spoilation of evidence claim in Count V, and denied as to the Rehabilitation Act claim in Count IV.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

**DATED:** _6-27-00_